**UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLORADO**

Civil Action No. 10-cv-01234-LTB-MJW

LEANNE R. DALTON, an individual

        Plaintiff,

v.

COUNTRYWIDE HOME LOANS, INC.,
a New York Corporation,
BANK OF AMERICA, NATIONAL ASSOCIATION,
a National Banking Association, f/k/a
COUNTRYWIDE BANK, FSB,
and BAC HOME LOANS SERVICING, LP,
a Texas Limited Partnership

        Defendants.

---

**DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS PURSUANT TO
FED. R. CIV. P. 12(c) AND FOR SUMMARY JUDGMENT PURSUANT TO FED. R.
CIV. P. 56 and D.C.COLO.L.CivR 56.1**

---

Defendants Countrywide Home Loans, Inc.; Bank of America, National Association;

Countrywide Bank, FSB; and BAC Home Loan Servicing, LP ("Defendants"), hereby submit

this Motion for Judgment on the Pleadings and for Summary Judgment on Plaintiff's claims for

relief. (the "Motion").  Defendants are entitled to: (1) judgment on the pleadings as a matter of

law pursuant to Fed. R. Civ. P. 12(c), or (2) summary judgment pursuant to Fed. R. Civ. P. 56

because there is no genuine dispute as to any material fact.

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1

Given the nature of the relief sought herein, counsel for Defendants did not confer with counsel for the Plaintiff.  Per D.C.COLO.LCivR 7.1 A., conferral with opposing counsel concerning a motion under Fed. R. Civ. P. 12 or 56 is not required.

## INTRODUCTION

Plaintiff Leanne Dalton ("Dalton")[1] obtained financing from Defendants in excess of $1.43 million for the acquisition of, and construction of improvements on, certain real property located at 34305 Ranchero Road, Evergreen, Colorado 80439 (the "Property").  The financing to acquire the Property was obtained through two loans in June 2007.  In July 2007, Dalton entered into a construction contract for substantial improvements to the Property.  As a result, and in September 2007, Dalton refinanced the loans obtained to acquire the Property in order to fund substantial construction improvements to the Property, and to retire the two June loans.

During the construction, Defendants discovered a budget shortfall.  The amount disbursed under the construction loan exceeded the percentage of the construction completed.  Even full disbursement of the loan amounts would not have bridged the gap.  Consequently, and after disbursing over 97% of the construction loan, Defendants ceased further disbursements per the terms of the construction loan agreement.  Defendants had no control over, or management of, Dalton's construction budget.  The construction budget fell below the actual costs of construction and was mismanaged by Dalton.

To get the project caught up, Dalton began to personally fund the construction.  But

---

[1] Dalton is hardly an unsophisticated borrower.  At the time she obtained financing from Defendants, she was a real estate broker and real estate investor claiming an income as a real estate broker of $300,000.00 per year.

2

despite having sufficient resources to continue this endeavor, Dalton decided not to complete the construction, and ultimately failed to repay the money loaned by Defendants.

Not only has Dalton failed to repay the loans, but Defendants accepted a short sale that resulted in a loss to Defendants in excess of $600,000.00.  As a condition to accepting the short sale, Defendants agreed to waive the deficiency amount owed by Dalton.  Nevertheless, Dalton filed a 22-page, 119-paragraph Complaint, containing 15 separate claims against the Defendants on May 27, 2010.

**STATEMENT OF UNDISPUTED MATERIAL FACTS**

1.      Dalton is a real estate broker associate who has sold hundreds of homes during her career, and has attended nearly all of the closings of those sales.  *See* Depo. Leanne Dalton 9:15 - 10:23 (April 19, 2011).  (Relevant portions of the Dalton Depo. are attached as Exhibit A.)

2.      On June 29, 2007, Plaintiff acquired certain real property located at 34305 Ranchero Road, Evergreen, Colorado 80439 (the "Property").  *See* Complaint, Doc. 1, ¶ 11; Answer, Doc. 9, ¶ 11; Exhibit A, Dalton Depo. 38:5-10.

3.      In June 2007, and in order to finance the acquisition of the Property, Plaintiff applied for, and subsequently obtained, two loans.  *See* June Loan Applications, attached hereto as Exhibit B and Exhibit C.  During the application process, Plaintiff claimed an income of $300,000.00 per year.  *See* Exhibits B & C, p. 2 of 4; Exhibit A, Dalton Depo. 59:2-5.

4.      The first loan, identified as Mortgage Loan Number 176028895, had a principal balance of $649,999.00, and closed on June 29, 2007.  *See* Complaint, Doc. 1, ¶ 12; Answer, Doc. 9, ¶ 12.

3

5.      The second loan, identified as Mortgage Loan Number 176028903, was for a line of credit in the amount of $173,651.00, and also closed on June 29, 2007.  (Together, these loans are referred to as the "June Loans.")  *See* Complaint, Doc. 1, ¶ 12; Answer, Doc. 9, ¶ 12.

6.      The June Loans were memorialized by corresponding promissory notes and deeds of trust.  *See* Interest Only Fixed Rate Note, attached as Exhibit D; Deed of Trust for first June Loan, attached as Exhibit E; Home Equity Credit Line Agreement and Disclosure Statement, attached as Exhibit F; and Deed of Trust for second June Loan, attached as Exhibit G.

7.      At the closing of the June Loans, and for both of the June Loans, Plaintiff also executed Loan Application Disclosure Acknowledgments, attached as Exhibits H & I, Truth in Lending Disclosure Statement, attached as Exhibit J, Important Terms of Our Home Equity Line of Credit, attached as Exhibit K, and Settlement Statements, attached as Exhibits L & M.

8.      When Plaintiff closed on the June Loans, she knew that she did not have a construction loan.  Exhibit A, Dalton Depo. 49:14-50:20, 66:13-67:12.

9.       On July 19, 2007, Plaintiff entered into a construction contract concerning the construction of improvements to the Property.  A copy of the construction contract, minus its exhibits, is attached as Exhibit N; *see also* Exhibit A, Dalton Depo. 47:19 – 48:6.

10.     In September 2007, and in order to finance the construction of substantial improvements to the Property, Plaintiff applied for additional loans that would, in addition to funding construction, retire the June Loans.  *See* September Loan Applications, attached as Exhibit O and Exhibit P; *see also* Exhibit A, Dalton Depo. 41:17-20, 66: 13-17.

11.     On September 10, 2007, the June Loans were refinanced as a construction loan

and a line of credit.  *See* Complaint, Doc. 1, ¶ 13; Answer, Doc. 9, ¶ 13.

12.     The construction loan, identified as Mortgage Loan Number 17765156, had a principal amount of $1,470,000.00 (the "September Construction Loan").  The September Construction Loan is evidenced by the Construction Loan Agreement with Security Agreement, attached as Exhibit Q, and the Note, with addendum, attached as Exhibit R; *see also* Complaint, Doc. 1, ¶ 13; Answer, Doc. 9, ¶ 13.

13.     The refinanced line of credit, identified as Mortgage Loan Number 177615172, was for a line of credit in the amount of $176,500.00 (the "September LOC").  The September LOC is evidenced by the Home Equity Credit Line Agreement and Disclosure Statement, including Home Equity Confirmation Agreement, attached as Exhibit S, along with the Home Equity Line of Credit Supplemental Agreement for Construction Loan, including Important Terms of Our Home Equity Line of Credit, attached as Exhibit T; *see also* Complaint, Doc. 1, ¶ 13; Answer, Doc. 9, ¶ 13.  (The September Construction Loan and the September LOC may sometimes be referred to collectively as the "September Loans.")

14.     Dalton was not eligible for a first draw under the September LOC until the construction improvements to the Property were completed.  Exhibit T, § 1, p. 1.

15.     At the closing of the September Loans, and for both September Loans, Plaintiff also executed Loan Application Disclosure Acknowledgments, attached as Exhibits U & V, Truth in Lending Disclosure Statement, attached as Exhibit W, Addendum to Home Equity Credit Line Agreement and Disclosure Statement, attached as Exhibit X, and the Settlement Statement corresponding to the September Loans, attached as Exhibit Y.

16.    By and large, Dalton did not read the loan documents.  Exhibit A, Dalton Depo. 87:15-88:4, 123:3-124:5, 126:7-18, 132:4-12, 139:3-9.

17.    Dalton's direct costs of construction, as approved by Defendants, were for a total amount of $640,553.00.  *See* Construction Loan Budget, line item 2.01, attached as Exhibit Z; *see also* Exhibit A, Dalton Depo. 112:8-10.

18.    On September 14, 2007, Countrywide made an initial disbursement under the September Construction Loan for the purpose of retiring the existing debt under the June Loans, to pay for closing costs, and to provide the construction contractor with some initial funding.  *See* Exhibit Y, Settlement Statement for September Construction Loan; *see also e.g.* Exhibit A, Dalton Depo. 71:4-18.

19.    Countrywide continued to make disbursements to Plaintiff under the September Construction Loan and ultimately disbursed a total amount exceeding $1.43 million. *See* Plaintiff's Responses to Defendants' First Set of Written Discovery, Response to RFA #1, p. 5, attached as Exhibit A1.  Therefore, over 97% of the September Construction Loan was disbursed.

20.    While Dalton was out of town on vacation, there was some construction work performed that was not authorized by Dalton.  Exhibit A, Dalton Depo. 45:11 - 24.

21.    Dalton changed her construction manager during construction.  *Id*. at 140:12-141:4, 242:6-11.

22.    Dalton's construction improvements were not completed by the required completion date of March 10, 2009.  *See* Declaration of John Parsons, attached as Exhibit A2;

*see also e.g.* Broker Price Opinion dated February 4, 2009, attached as Exhibit A3; Dalton Depo. 180:4-9.

23. Dalton's construction costs exceeded those associated with the approved direct costs of construction. *Id*. 113:1-114:1-24, 138:11-139:9, 154:3-24, 156:19-157:10.

24. Plaintiff did not track the percentage of completion of the project relative to the percentage of the disbursements made under the September Loans. Exhibit A, Dalton Depo, 54:11-19.

25. As of May 2008, the percentage of the September Loans disbursed was greater than the percentage of construction completed. *See e.g.* Exhibit A, Dalton Depo. 232:19-25; *see also e.g.* May 6, 2008 inspection report, attached as Exhibit A4.

26. Disbursement of the remaining loan proceeds available under the September Loans was not sufficient to pay the remaining costs of construction. Exhibit A, Dalton Depo. 138:11-139:9, 156:19-157:10.

27. Plaintiff used her own funds to pay for some costs of construction. *Id*. at 106:19-21.

28. Plaintiff did not deposit her personal funds into the Project Control Account. *Id*. at 106:22-107:9, 273:1-3.

29. Plaintiff did not timely make all interest payments when due. Exhibit A2, ¶¶4-5; *see also* Exhibit A, Dalton Depo. 235:12-17.

30. On February 1, 2009, Plaintiff indicated that she would not be making any further loan payments. *See* Email dated February 1, 2009 from Dalton to Countrywide, attached as

Exhibit A5; *see also* Exhibit A, Dalton Depo. 178:19-179:2.  Dalton made no further payments to Defendants, or any of them, after December 2008.  *See e.g.* Exhibit A2, ¶5.

31.    Plaintiff had the financial ability to make further loan payments and/or continue the construction but chose not to.  Exhibit A, Dalton Depo. 24:15-23, 27:2-18, 154:19-25, 174:16-25, 178:19-179:8, 180:4-9; 197:19-199:6.

32.    Plaintiff did not repay the September Loans when due.  *Id*. 41:5-9, 164:20-165:10, 182:23-183:17, 220:17-24.

33.    Defendants accepted a short sale of the Property for a purchase price of $850,000.00.  *Id.* at 183:14-17; *see also* Settlement Statement from the Short Sale of the Property on April 24, 2009, attached as Exhibit A6; *see also* Letter from Countrywide to Dalton dated March 23, 2009, attached as Exhibit A7.

34.    Defendants received $775,312.49 in proceeds from the short sale, resulting in a loss to Defendants in excess of $600,000.00.  *See* Exhibit A6; Exhibit A, Dalton Depo. 183:14-17.

35.    Consequently, Defendants received and Dalton repaid less than the amount due under the September Loans.  Exhibit A, Dalton Depo. 41:5-9, 164:20-165:10, 182:23-183:17, 220:17-24.

36.    Defendants furnished information to credit reporting agencies concerning the September Loans.  *See* Complaint, Doc. 1, ¶ 117; Answer, Doc. 9, ¶ 117.

37.    Defendants are not seeking to recover the amount of deficiency from Plaintiff. Exhibit A, Dalton Depo. 199:7-20; *see also* Exhibit A7.

## STANDARD OF REVIEW

A motion for judgment on the pleadings under Fed. R. Civ. P. 12(c) is governed by the same "standard of review applicable to a Rule 12(b)(6) motion to dismiss." *Corder v. Lewis Palmer School Dist. No. 38*, 556 F.3d 1219, 1223 (10th Cir. 2009). Thus, "a court must accept as true all well-pleaded facts, as distinguished from conclusory allegations, and those facts must be viewed in the light most favorable to the nonmoving party." *Moss v. Kopp*, 559 F.3d 1155, 1159 n. 1 (10th Cir. 2009). To survive judgment, the complaint "must contain enough facts to state a claim for relief that is plausible on its face." *Anderson v. Suiters*, 499 F.3d 1228, 1232 (10th Cir. 2007). The allegations must plausibly, and not just speculatively, support the claim for relief. *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008).

The purpose of a summary judgment motion under Fed. R. Civ. P. 56 is to assess whether trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary judgment is appropriate if the record reveals that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment shall be entered against a party who fails to establish sufficiently an essential element in that party's case, one on which the plaintiff bears the burden of proof at trial. *See Price v. Public Serv. Co. of Colo.*, 1 F.Supp.2d 1216, 1221 (D. Colo. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

A primary objective of summary judgment is to dispose of factually unsupported claims, and a court should interpret Fed. R. Civ. P. 56 in a manner that allows it to accomplish this purpose. *See Celotex*, 477 U.S. at 323-24. If the movant carries its burden of showing the

9

absence of a genuine dispute as to any material fact, the non-movant must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof. *Celotex*, 477 U.S. at 322. A complete failure of proof of an essential element of the party's claim necessarily renders all other facts immaterial. *Id*. at 322-23. Additionally, when determining the adequacy of the non-movant's opposition to a summary judgment motion, a decision should be based on whether reasonable jurors could find, by a preponderance of the evidence, the non-movant is entitled to a verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986).

## ARGUMENT

**I.      Dalton's claims for damages under TILA and HOEPA (and related Colorado statutes) are barred by the applicable statutes of limitation.**

Dalton's ninth through eleventh claims for relief are based on alleged violations of the Truth in Lending Act ("TILA"), and her twelfth claim for relief is based on alleged violations of the Home Ownership and Equity Protection Act ("HOEPA"). TILA was enacted by Congress to protect consumers from uninformed participation in credit transactions by implementing disclosure requirements. 15 U.S.C. §§ 1601-15. These requirements are intended to ensure the disclosure of essential terms and costs related to consumer credit lines. The actual regulations and limitations of TILA are found in Regulation Z. 12 C.F.R. § 226. Alleged violations of HOEPA—which amends TILA and was enacted to place similar requirements on high-cost loans to consumers—are governed by the TILA regulations. *See* 12 C.F.R. § 226.32; *McDaniel v. Denver Lending Group, Inc.*, 2009 WL 1873581, *14 (D. Colo. 2009). Therefore, the alleged disclosure violations under either TILA or HOEPA are analyzed under TILA's Regulation Z.

Claims for statutory and actual damages under TILA must be brought within one year of the alleged violation. *See* 15 U.S.C. § 1640(e); *see also  Kruse v. Countrywide Home Loan Servicing, LP*, 2010 WL 3791044, *2 (D. Colo. 2010); *Betancourt v. Countrywide Home Loans, Inc.*, 344 F. Supp. 2d 1253, 1257 (D. Colo. 2004).  The governing section provides that "[a]ny action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation."  15 U.S.C. § 1640(e); *see also McDaniel*, 2009 WL 1873581, *14 (stating that "because HOEPA is an amendment of TILA, a one-year statute of limitations applies").  "A violation occurs, and the one year limitations period begins to run, when credit is extended through the consummation of the transaction between the creditor and its customer without the required disclosures being made."  *Betancourt*, 344 F. Supp. 2d at 1258.

Dalton's fourteenth claim for relief asserts that alleged disclosure violations under TILA and HOEPA "also constitute violations of Colorado statute pursuant to C.R.S. § 5-3-101."  *See* Complaint, Doc. 1, at ¶ 111.  To the extent Dalton's fourteenth claim for relief is not preempted by federal law, this claim is also governed by a one-year statute of limitations. *See* C.R.S. § 5-5-202(5).

For Dalton's ninth through twelfth and fourteenth claims for relief, the applicable statutes of limitation began to run the moment Dalton closed on her June and September Loans.  Each of the alleged violations "occurred at the time the transaction was consummated, and the continued failure to make the disclosures over the life of the loan is not a continuing violation of the statute."  *Betancourt*, 344 F. Supp. 2d at 1259 (citing *Stevens v. Rock Springs Nat'l Bank*, 497

F.2d 307, 309 (10th Cir. 1974)).  Here, and using the September Loan closing date of September

10, 2007, the applicable statutes of limitation ran out on September 10, 2008—long before

Dalton filed this action on May 27, 2010.  Therefore, Dalton's claims for statutory and/or actual

damages under TILA and HOEPA (and related Colorado statutes referenced in Dalton's

fourteenth claim for relief) for alleged disclosure violations are all time barred, and judgment

should enter as a matter of law dismissing these claims with prejudice.

**II.    There is no private cause of action for Dalton's RESPA claim.**

Dalton's thirteenth claim for relief—her Real Estate Settlement Procedures Act

("RESPA") claim—fails as a matter of law because there is no private cause of action available

to her.  Congress enacted RESPA to help regulate the charges imposed by lenders, the

disclosures related to loan transfers, and the use of kickbacks and other abusive practices.  *See* 12

U.S.C. § 2601 (the congressional findings and purpose).  Each section of RESPA for which there

is a private cause of action has an accompanying provision that describes the civil remedies and

applicable statute of limitations.  *See* 12 U.S.C. § 2601 *et seq.*; 12 U.S.C. §§ 2605(f), 2607(d)(2),

(5), and 2608(b).

Dalton's Complaint fails to identify specific provisions of RESPA that were violated.

But since Dalton's allegations identifying the "RESPA violations" all apply to disclosures that

were allegedly defective or not timely presented to her, such violations fall under §§ 2603 and

2604 of RESPA.  *See* Complaint, Doc. 1, ¶¶ 105-108.  Sections 2603 and 2604 of RESPA

govern what disclosures, including the HUD-1 Settlement Statement and special informational

booklets, are required to be provided to the borrower.  12 U.S.C. §§ 2603, 2604.  RESPA Section

4 requires lenders to "conspicuously and clearly itemize all charges imposed upon the borrower and all charges imposed upon the seller in connection with the settlement[.]" 12 U.S.C. § 2603(a). Yet, the plain language of the statue does not provide a claim for relief for a violation of Section 4.

Accordingly, if Dalton is asserting that Defendants violated §§ 2603 and 2604 of RESPA, these alleged violations do not give rise to any actionable claim. *See Agbabiaka v. HSBC Bank USA Nat. Assn.,* No. C 00-05583 JSW, 2010 WL 1609974, 4 (N.D. Cal. Apr. 20, 2010) (holding "[t]here is no private right of action under RESPA for violations of Sections 2603 and 2604"). Here, Dalton has failed to allege facts under a Section of RESPA that provides for a private cause of action, necessitating the entry of judgment against her on her thirteenth claim for relief.

Notwithstanding the existing statutory and case law recognizing that her claim for damages under §§ 2603 and 2604 is not actionable, Dalton acknowledged in writing that she received all disclosures required by TILA and RESPA, and she executed the HUD-1 Settlement Statements for each loan closing at issue in this case that clearly itemized the charges imposed. *See* Exhibits H-M; Exhibits U-Z. Therefore, Dalton's claim that Defendants violated RESPA has no remedy at law, no basis in fact, and judgment on this claim pursuant to Fed R. Civ. P. 12(c) or 56 should enter against Dalton.

**III.    Dalton lacks standing to bring her second claim for relief alleging violations of the CCPA.**

The Colorado Supreme Court adopted a five-part test of standing to sue under the Colorado Consumer Protection Act ("CCPA"). *Hall v. Walter*, 969 P.2d 224, 235 (Colo. 1998). To prove a private cause of action under the CCPA, a plaintiff must show each of the following:

> (1) the defendant engaged in an unfair or deceptive trade practice; (2) the challenged practice occurred in the course of defendant's business, vocation, or occupation; (3) the practice significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property; (4) the plaintiff suffered injury in fact to a legally protected interest; and (5) the challenged practice caused the plaintiff's injury.

*Id*.

### a.   Defendants have not engaged in a deceptive trade practice.

Dalton must show that Defendants knowingly made a false representation which induced her "to act, refrain from acting, or have the capacity or tendency to attract customers." *Rhino Linings USA, Inc. v. Rocky Mtn. Rhino Lining, Inc.*, 62 P.3d 142, 147 (Colo. 2003). Here, Defendants did not knowingly make any false representations to Dalton that induced her to enter into either the June or September Loans. Moreover, and as provided in more detail below, any representations or warranties made in connection with the negotiation or performance of the June or September Loans are barred by the credit agreement statute of frauds unless they are in writing and signed by Defendants. C.R.S. § 38-10-124(2).

### b.   Dalton cannot show a significant public impact.

Standing to sue under the CCPA requires Dalton to establish that the Defendants' alleged deceptive trade practice had a significant "public impact" on actual or potential consumers, so as to distinguish run-of-the-mill fraud and contract disputes from actionable CCPA violations. *See Hall*, 969 P.2d at 235; *Rhino Linings USA*, 62 P.3d at 146-47; *see also Colo. Coffee Bean, LLC v. Peabury Coffee Inc.*, ---P.3d---, 2010 WL 547633 (Colo. App. 2010).

The Colorado Supreme Court has held that there are three factors relevant to determine whether a challenged practice significantly impacts the public: "(1) the number of consumers directly affected by the challenged practice; (2) the relative sophistication and bargaining power of the consumers affected by the challenged practice; and (3) evidence that the challenged practice previously impacted other consumers or has significant potential to do so in the future." *Rhino Linings USA*, 62 P.3d at 149.  In *Rhino Linings USA*, the court held that misrepresentations made only to a single party, with resulting injury to the plaintiff, were insufficient to support judgment on a CCPA claim.  *Id.*; *see also Callahan v. First Am. Title Ins. Co.*, 837 P.2d 769 (Colo. App. 1992) (affirming directed verdict against CCPA claim based on a single transaction, rather than a course of conduct, where record contained no evidence supporting deceptive trade practice claim); *see also Anson v. Trujillo*, 56 P.3d 114 (Colo. App. 2002) (holding that plaintiff lacked standing to sue under the CCPA because plaintiff did not present any evidence that other actual or potential consumers were affected by defendant's misrepresentations made with respect to one real estate transaction).

Dalton's Complaint is completely devoid of any allegation that Defendants' conduct significantly impacts the public.  *See* Complaint, Doc. 1, ¶¶ 52-56.  The CCPA claim asserted against Defendants is facially deficient, is therefore not actionable, and fails as a matter of law. And Dalton's deposition testimony further demonstrates that the public was not impacted. Exhibit A, Dalton Depo. 226:22-25, 227:1-25, 228:1-15.  The alleged deceptive trade practices, or alleged false representations, were directed solely at Dalton, and only with regard to the transactions at issue.  The crux of Dalton's case is that Defendants did not fully disburse the

15

September Loans based on specific facts only affecting the Property.  Because Dalton has not alleged, and is unable to show, that the alleged deceptive trade practices significantly impact the public, Dalton lacks standing to bring her CCPA claim.

        c.  <u>There is no causal connection between the alleged CCPA violations and Dalton's supposed damages</u>.

To recover under the CCPA claim, Dalton must show that the alleged violations of the CCPA caused her to suffer an injury to a legally protected interest, *i.e.*, that Defendants' alleged violations of the CCPA caused her damages.  By failing to repay the loan from Defendants, Dalton materially breached the applicable loan agreements.  Yet she now seeks an unknown amount of damages against Defendants.  Any alleged damages suffered by Dalton were based not on Defendants' refusal to disburse additional funds, but occurred due to Dalton's mismanagement of the construction budget and her decision to stop construction before it was complete despite having the financial ability to continue.  There is no causal connection between Defendants' conduct and Dalton's purported damages.  The only "harm" suffered in this case was absorbed by Defendants upon agreeing to the short sale of the Property at a loss to Defendants exceeding $600,000.00, and waiving the right to seek the deficiency amount from Dalton.

Dalton has the burden to prove all five elements described above before she has standing to bring her CCPA claim. But Dalton can only prove one of the elements—that the challenged practice occurred in the course of defendant's business, vocation, or occupation.  Therefore, judgment should enter against her on her CCPA claim.

16

**IV.    Dalton's claims for fraudulent misrepresentation, promissory estoppel, unjust enrichment, breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing, and outrageous conduct are barred by operation of Colorado's credit agreement statute of frauds.**

Colorado's credit agreement statute of frauds prohibits a debtor or creditor from filing or maintaining any claim "relating to a credit agreement involving a principal amount in excess of twenty-five thousand dollars unless the credit agreement is in writing and signed by the party against whom enforcement is sought."  C.R.S. § 38-10-124(2).

Colorado courts are to construe the credit agreement statute of frauds broadly to effectuate its purposes.  *Schoen v. Morris*, 15 P.3d 1094, 1099 (Colo. 2000); *Premier Farm Credit, PCA v. W-Cattle, LLC*, 155 P.3d 504, 522 (Colo. App. 2007).  The credit agreement statute of frauds was enacted to "discourage lender liability litigation and to promote certainty into credit agreements involving sums of more than $25,000."  *Schoen*, 15 P.3d at 1098 (demonstrating that "the legislature hoped to curtail suits against lenders based on oral representations").

"The credit agreement statute of frauds expressly bars *all claims* relating to a credit agreement unless the credit agreement is in writing."  *Lang v. Bank of Durango*, 78 P.3d 1121, 1123 (Colo. App. 2003) (emphasis in original) (affirming trial court's decision to bar claims of negligent misrepresentation, fraud, and unjust enrichment based on the credit agreement statute of frauds); *see also Hewitt v. Pitkin County Bank & Trust Co.*, 931 P.2d 456, 459 (Colo. App. 1995) (affirming the trial court's decision to bar all claims for breach of fiduciary duty, negligent misrepresentation, outrageous conduct, and interference with a prospective business advantage).

17

Here, Dalton's causes of action for fraudulent misrepresentation, unjust enrichment,[2] promissory estoppel, breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing, and outrageous conduct all relate to the credit agreements at issue and are therefore barred by operation of the credit agreement statue of frauds. Dalton cannot point to any writing signed by Defendants that support these causes of action. Rather, Dalton relies solely on purported verbal conversations for support. Consider as an example the following allegation supporting Dalton's fraudulent misrepresentation claim:

> The *representations* of Countrywide were material to Dalton's decision to enter into the agreements related to the Loans, acquire the Property, commence construction on the Property, to contribute her own funds in addition to the Loan amounts toward construction and other work on the Property, and to ultimately enter into a short sale to sell the Property.

*See* Complaint, Doc. 1, ¶ 46 (emphasis added). Or take as another example the allegations supporting Dalton's claim for promissory estoppel that repeatedly reference "promises and representations" made by Defendants. *See id*. at ¶¶ 64, 65, 67. Or consider relevant portions of Dalton's deposition, demonstrating her complete reliance on alleged verbal communications to support her lawsuit, despite, and in contradiction to, express terms of the written and executed credit agreements. *See e.g.* Exhibit A, Dalton Depo. 193:19-25, 218:2-219:4, 230:1-18, and 238:5-9. In fact, it was not until she was deposed that she realized what the loan documents actually provided. *Id*. at 87:15-88:4, 123:3-124:5, 126:7-18, 132:4-12, 139:3-9.

---

[2] Dalton's unjust enrichment claim is even more incredible when considering the following facts: (1) Defendants loaned her over $1.43 million dollars, (2) she defaulted under the September Loans, (3) Defendants accepted a short sale of the Property having a purchase price of $850,000.00, and received proceeds in the amount of $775,312.49 from the short sale at a loss to Defendants exceeding $600,000.00, and (4) Defendants are not pursuing a claim against Dalton for the remaining deficiency.

Dalton's claims relating to the June and September Loan documents forming the credit agreements, but extending to the pre-closing oral representations and negotiations and the oral representations made during the performance of the June and September Loans, are all barred by operation of law.

> [a]ny representations and warranties made or omissions in connection with the negotiation, execution, administration, or performance of, or collection of sums due under, any credit agreements defined in subparagraphs (I) and (II) of this paragraph (a).

C.R.S. § 38-10-124(1)(a)(III).  Under the credit agreement statute of frauds, Dalton is prohibited from filing or maintaining an action or claims against Defendants relating to such communications or actions unless they are in writing and signed by Defendants.  C.R.S. § 38-10-124(2).  And a credit agreement may not be implied under any circumstances.  C.R.S. § 38-10-124(3).  Therefore, Dalton's causes of action referenced above in this section are all barred by operation of the credit agreement statute of frauds, and judgment should enter against Dalton on those claims.

### V.    Defendants did not owe Dalton a fiduciary duty.

Dalton's seventh cause of action claims that Defendants breached a fiduciary duty that was owed to her.  *See* Complaint, Doc. 1 at ¶¶ 74-76.  But under Colorado law, "no per se fiduciary relationship exists by virtue of the borrower-lender relationship between a bank or a bank's officer and a customer of the bank." *First Nat'l Bank of Meeker v. Theos*, 794 P.2d 1055, 1060 (Colo. App. 1990).  A fiduciary duty does not exist simply because one party is a borrower

and the other is a lender. *Id*. A fiduciary duty may arise out of a confidential relationship. *Rubenstein v. South Denver Nat'l Bank*, 762 P.2d 755, 756 (Colo. App. 1988). But the existence of a confidential relationship, without more, is insufficient to establish a fiduciary duty. *Equitex, Inc. v. Ungar*, 60 P.3d 746, 752 (Colo. App. 2002) (citing *Bock v. Brody*, 879 P.2d 530, 533 (Colo. App. 1993)).

Dalton has not even met the burden of establishing that a confidential relationship existed. *First Nat'l Bank of Meeker*, 794 P.2d at 1061. In fact, the Complaint makes no allegation that a confidential relationship existed between her and any of the Defendants. But even if Dalton had submitted a formulaic recitation of the elements, it would not suffice. *Bixler v. Foster*, 596 F.3d 751, 756 (10th Cir. 2010) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

In support of Dalton's claim for breach of fiduciary duty, she alleges that "Countrywide, in advising Dalton regarding the expenditure of her own funds toward certain construction projects on the Property, had a fiduciary duty to its [sic] Dalton. . . ." *See* Complaint, Doc. 1, ¶ 75. When it became evident that the percentage of the September Construction Loan was greater than the percentage of the construction completed, Dalton was informed that she needed to get the project caught up before disbursements would continue. Exhibit A, Dalton Depo. 144:6-147:16, 273:19-274:16. A fiduciary relationship—and certainly, a breach of a fiduciary duty— could not have arisen from such communication. Therefore, and in addition to being barred by Colorado's credit agreement statute of frauds, Dalton's claim for breach of fiduciary fails, and judgment on her seventh claim for relief should enter against her.

**VI.    Dalton's outrageous conduct claim fails to state a plausible claim for relief.**

In order to succeed on her eighth claim for relief against Defendants for outrageous conduct, Dalton must prove that: "(1) [Defendants] engaged in extreme and outrageous conduct, (2) recklessly or with the intent of causing [Dalton] severe emotional distress, and (3) causing [Dalton] severe emotional distress." *Green v. Qwest Servs. Corp.*, 155 P.3d 383, 385 (Colo. App. 2006). Whether the conduct supporting this claim is outrageous is a threshold matter to be determined as a matter of law. *Id*. (citing *Coors Brewing Co. v. Floyd*, 978 P.2d 663, 665 (Colo. 1999)). Summary judgment is appropriate if "the court determines that no reasonable person could conclude that the defendant's conduct was outrageous." *Bauer v. Southwest Denver Mental Health Center, Inc.*, 701 P.2d 114, 118 (Colo. App. 1985). For liability for outrageous conduct to exist, "the conduct [has to be] so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Id*. In order to state an actionable claim for outrageous conduct in Colorado, Dalton "must allege behavior by a defendant that is extremely egregious." *Coors*, 978 P.2d at 665.

Dalton's eighth claim for relief simply contains a formulaic recitation of the elements for an outrageous conduct claim, supported only by conclusory statements. *See* Complaint, Doc. 1, ¶¶ 78-82; *see also Bixler*, 596 F.3d at 756. To the extent Dalton bases this claim on the allegation that ". . . in an exceptionally hostile and rude telephone call, a representative of Countrywide yelled at Dalton that no further amounts would be disbursed to her under the Loans," such conduct, even if true, does not rise to the level of outrageous conduct. *See*

21

Complaint, Doc. 1, ¶26; *see also* <u>Exhibit A</u>, Dalton Depo. 124:10-125:1; *see e.g. Schneider v. TRW, Inc.*, 938 F.2d 986, 992 (9th Cir. 1991) (no outrageous conduct where supervisor yelled, screamed at, and made threatening gestures to employee).  "Citizens in our society are expected to withstand petty insults, unkind words and minor indignities.  Such irritations are part of normal, every day life and constitute no legal causes of action."  *Street v. U.S. Corrugated, Inc.*, 2011 WL 304568, *7 (W.D. Ky 2011) (quoting *Osborne v. Payne*, 31 S.W.3d 911, 914 (Ky. 2000)).  In *Street*, the court held that while "[t]he profanity, yelling, degrading comments, and threats . . . [were] unacceptable and offensive, [they were] not sufficiently outrageous" to support the claim for outrageous conduct.  2011 WL 304568 at *7.

Dalton cannot meet her burden of proving that Defendants engaged in conduct that was outrageous.  Therefore, and in addition to being barred by operation of Colorado's credit agreement statute of frauds, judgment on Dalton's eighth claim for relief should be entered against her.

## VII.    Dalton's defamation claim fails because it is preempted by the Fair Credit Reporting Act, and because the alleged defamatory statement is true.

Dalton's state law defamation claim is preempted by the Fair Credit Reporting Act ("FRCA").  15 U.S.C. § 1681t(b)(1)(F) explicitly preempts all state laws in the areas covered by § 1681s-2:

> No requirement or prohibition may be imposed under the laws of any State (1) with respect to any subject matter regulated under
>
> * * *
>
> (F) section 1681s-2 of this title, relating to the responsibilities of persons who furnish information to consumer reporting agencies, except that this paragraph shall not apply to [certain specified

22

provisions of the Massachusetts Annotated Laws and the
California Civil Code].

15 U.S.C. § 1681t(b)(1)(F).

"This section has been called 'the absolute immunity provision' which, if applicable, bars any state law claim based on conduct which is governed by § 1681s-2." *Sigler v. RBC Bank (USA)*, 712 F.Supp.2d 1265, 1269 (M.D. Ala. 2010) (internal citation omitted).  This section of the FRCA "does not allow for state law prohibitions or requirements which relate to the responsibilities of furnishers of information to consumer reporting agencies."  *Id*. (internal citation omitted).

In *Sigler*, the plaintiff brought a claim for defamation against a lender for publishing inaccurate information to credit reporting agencies.  *Id*. at 1268.  The lender moved to dismiss the state law cause of action for defamation, among others, because the FRCA preempted it.  *Id*.  Finding that the lender was a furnisher of information, as contemplated by the FRCA, the court granted the lender's motion to dismiss and dismissed the defamation claim with prejudice.  *Id*. at 1270-71.

Here, and in support of Dalton's defamation claim, it is undisputed that Dalton alleges that "Countrywide reported false information to credit reporting agencies. . . ."  *See* Complaint, Doc. 1, ¶ 117.  As a furnisher of information to credit reporting agencies, Defendants are governed by the FRCA, which clearly preempts Dalton's state law cause of action for defamation.  Therefore, judgment should enter against Dalton on her fifteenth claim for relief.

Nevertheless, Dalton bases her defamation claim on Defendants' reporting of false information to credit reporting agencies concerning: (1) the number of payments missed by

Dalton, and (2) for the statement contained in Dalton's credit report pertaining to the September

Loans that the "creditor settled for less than amount due."  *See* Complaint, Doc. 1, at ¶117; *see*

*also* Exhibit A, Dalton Depo. 40:24-25, 41:1-9.  In order to maintain a cause of action for

defamation, at a minimum, there must be publication of a false statement of a defamatory act.

*Churchey v. Adolph Coors Co.*, 759 P.2d 1336, 1341 (Colo. 1988).

The reporting issue related to the number of payments missed by Dalton has been

corrected and resolved.  *See* Exhibit A, Dalton Depo. 183:17-25, 184:1-5.  Consequently, the

only alleged defamatory statement remaining is the statement in Dalton's credit report stating

that the "creditor settled for less than amount due."  *Id*. at 184:6-13.

But this statement is true.  *Id*. at 182:23-25, 183:1-13, 220:17-25.  As a result, Dalton

cannot meet her burden of proving the falsity of the alleged defamatory statement, and judgment

on her defamation claim should be entered against her.

## VIII.    Defendants did not breach any contractual obligations owed to Dalton under the credit agreements.

Dalton's main contention in support of her third claim for relief is that Defendants

"breached the agreements related to the September Loans . . . in failing and refusing to disburse

all amounts promised in the Loan agreements."  *See* Complaint, Doc. 1, ¶ 61.  Defendants

ultimately disbursed over 97% of the September Construction Loan to Dalton.  And the parties

agreed in writing that the first draw under the September LOC would not be made until the

construction is completed.  Exhibit T, at § 1.[3]  But Dalton did not cause the construction to be

---

[3] The agreement that the first draw under the September LOC would not be made until the completion of the construction improvements is also evidenced by the last page of Exhibit T, at the "First Loan" section of the page titled, "Important Terms of Our Home Equity Line of Credit Addendum for Construction Loan."

24

completed by the deadline of March 10, 2009 or otherwise.  Consequently, a draw under the

September LOC never ripened.  And Defendants' decision to discontinue disbursements under

the September Construction Loan was authorized by the Construction Loan Agreement.

As expressly provided under the Construction Loan Agreement:

> [Dalton] shall cause the Improvements to be constructed not later
> than [March 10, 2009] for a price not to exceed [$640,553.00], and
> in accordance with the Plans and a Construction Contract approved
> in writing by the Lender . . . between [Dalton] and the Contractor.
> *Lender shall have no obligation to disburse Loan Proceeds at any
> time if [Dalton] fails to perform any or all of [her] obligations in
> the Loan Documents. . . .*

Construction Loan Agreement, Exhibit Q, ¶ 1.1, p. 1 of 10 (emphasis added).

Defendants' obligation to disburse loan proceeds was also expressly conditioned upon,

among other things, "[e]vidence satisifactory to Lender that: (i) the Loan Proceeds are sufficient

to pay costs of construction remaining to be performed in accordance with the Budget and Plans

approved by Lender."  *Id*. at ¶ 2.(b), p. 2 of 10.  The Construction Loan Agreement also made

clear that

> [i]n addition to the specific conditions and requirements contained
> below in Sections 5.4 through 5.9 inclusive, Lender shall not be
> obligated to pay any disbursements of Loan Proceeds unless and
> until all requirements listed on Exhibit D are satisfied prior to each
> such disbursement.

*Id*. at ¶ 5.3, pp. 5-6 of 10.

One of the requirements in Exhibit D of the Construction Loan Agreement states that "no

Event of Default . . . has occurred and is continuing, and *no event has occurred that with notice*

25

*or the passage of time could become such an Event of Default.*"  *Id*. at <u>Exhibit D</u>, ¶ j (emphasis

added).

Moreover, it was expressly understood and acknowledged by Dalton that:

> if the Improvements are not completed and the final disbursement
> of the Loan has not occurred pursuant to Section 5.9 below by
> [March 10, 2009], Lender is under no obligation to grant an
> extension of the Required Completion Date and in addition to any
> other remedy Lender may have, . . . Lender shall have the right to
> declare the Loan immediately due and payable.

*See id*. at ¶ 3.1, p. 3 of 10.

> [Dalton] shall not use [her] own funds to pay for any costs of
> construction without first having deposited them into the Project
> Control Account, and that if [Dalton] breaches this covenant,
> [Dalton] shall not be entitled to reimbursement for such costs, and
> Lender shall have no obligation to reimburse [Dalton], from any
> Loan Proceeds or from Project Control Account (in addition to all
> other remedies which Lender has under the Loan Documents).

*See id*. at ¶ 4.1, p. 5 of 10.

> Lender may withhold all further disbursements of Loan Proceeds
> and funds in the Project Control Account until all such additional
> funds have been deposited by [Dalton].  The failure of Borrower to
> provide such additional funds shall constitute an Event of Default
> hereunder.

*See id*. at ¶ 4.3, p. 5 of 10.

> Lender does not represent that the amount of undisbursed Loan
> Proceeds is sufficient to complete the Improvements, and Lender
> has no obligation, if the funds are not sufficient for the purpose, to
> complete the Improvements with its own or other funds or to
> advance additional funds.

*See id*. at ¶ 7.2(a), p. 7 of 10.

And any event of default by Dalton "terminates any obligation of the Lender to make the Loan or to continue disbursing the Loan, and shall permit Lender, at its option, to declare the Note immediately due and payable. . . . *See id.* at ¶ 8.1, p. 8 of 10. And finally, the Notice to Borrower Regarding the One Time Close Construction Loan, signed by Dalton on September 10, 2007, states:

> Lender is not obligated to pay any disbursement unless and until all requirements associated with the Draw Request are satisfied prior to each such disbursement. The lender customarily will not advance construction funds until **after** the materials are purchased and installed.

Notice to Borrower Regarding the One Time Close Construction Loan, Exhibit A8 (emphasis added).

In order to be eligible for a draw, Dalton had to certify, among other things, that "the labor, services and/or materials covered [under the draw request] have been performed upon or furnished to the . . . Property," and that "the estimated cost to complete construction does not exceed the sum of the undisbursed Loan Amount plus the amount held in the Project Control Account." *See* Draw Request form signed by Dalton and her construction manager, attached as Exhibit A9.

Here, Dalton did not satisfy many of the conditions precedent to further disbursements of the loan, including but not limited to:

- Failure to keep the construction costs per the approved budget;

- Failure to show evidence satisfactory to Lender that disbursement of the remaining Loan Proceeds were sufficient to pay the remaining costs of

construction;

- Failure to deposit her own funds into the Project Control Account;

- Failure to complete construction by March 10, 2009; and

- Failure to make payments on the September Loans when due, despite having

    funds available to do so.

Consequently, Dalton's breach of contract claim fails, and in any event, is barred by her

own breaches of contract.

### IX.     Dalton's claim for breach of the implied covenant of good faith and fair dealing fails as a matter of law.

The 10th Circuit has summarized the implied duty of good faith and fair dealing under

Colorado law as follows:

> [T]he implied duty of good faith and fair dealing limits a party's
> ability to act unreasonably in contravention of the other party's
> *reasonable expectations*, even if the express terms of a contractual
> provision appear to permit unreasonable actions.
>
> This duty applies when one party has discretionary authority to
> determine certain terms of the contract, such as quantity, price, or
> time.  A breach may occur when one party uses discretion
> conferred by the contract to act dishonestly or to act outside of the
> accepted commercial practices to deprive the other party of the
> benefit of the contract.
>
> On the other hand, the duty of good faith and fair dealing, as
> interpreted by Colorado case law, requires only that the parties to a
> contract perform the obligations imposed by the agreement in good
> faith and in a reasonable manner.  The question of good faith is
> determined on a case-by-case basis.  In Colorado, good faith
> performance of a contract emphasizes faithfulness to an agreed
> common purpose and consistency with the *justified expectations* of
> the other party.

> While the covenant of good faith may be relied on when the manner of performance under the contract terms allow for discretion on the part of either party, it cannot contradict terms or conditions for which a party has bargained.
>
> The duty of good faith and fair dealing does not obligate a party to accept a material change in the terms of the contract, assume obligations that vary or contradict the contract's express provisions, or inject substantive terms into the contract.

*CoBank v. Reorg. Farmers Coop. Assn.*, 170 Fed.Appx. 559 (10th Cir. 2006) (unpublished opinion) (emphasis in original, internal citations, quotation marks, and formatting omitted).

As provided above in Section VIII, Defendants' actions and performance were consistent with the terms of the credit agreements. Dalton's arguments supporting her lawsuit, if accepted, would materially alter or inject substantive terms into those previously bargained for credit agreements. And vague or generic oral representations allegedly made by Defendants are not only barred by operation of the credit agreement statute of frauds, but cannot modify the express terms of the applicable credit agreements. Nor can they apply to a breach of the implied duty of good faith and fair dealing that must be tied to an express provision of a written contract.

Moreover, Defendants dealt with Dalton in good faith and settled the September Loans more than fairly. Defendants accepted the short sale at a loss of over $600,000.00, with knowledge that Dalton had $150,000.00 in her bank account and a similar amount of equity in her existing home, did not require her to pay that amount to them, and waived seeking the deficiency amount from her. *See* Exhibit A6; Exhibit A, Dalton Depo. 24:15-23, 27:2-18, 154:19-25, 174:16-25, 178:19-179:8, 180:4-9, 183:14-17, 197:19-199:6; *see also* Exhibit A7.

Accordingly, Dalton's claim for breach of the covenant of good faith and fair dealing fails, and judgment should enter against Dalton on her sixth claim for relief.

## CONCLUSION

For the arguments, authorities, and evidence relied upon herein, Defendants respectfully request that the Court enter judgment as of matter of law, under either Fed. R. Civ. P. 12(c) or 56, on each one of Dalton's fifteen claims for relief.  More specifically, Defendants request that judgment enter against Dalton on her: (1) ninth through twelfth, and fourteenth, claims for relief as barred by the applicable statutes of limitation, (2) thirteenth claim for relief because there is no private cause of action for her RESPA claim, (3) second claim for relief because she does not have standing to bring the CCPA claim, (4) first and fourth through eighth claims for relief because they are barred by operation of Colorado's credit agreement statute of frauds, (5) seventh claim for relief because Defendants did not owe Dalton a fiduciary duty, (6) eighth claim for relief because Dalton's outrageous conduct claim fails to state a plausible claim for relief, (7) fifteenth claim for relief because Dalton's defamation claim is preempted by FCRA and based on a true statement, (8) third claim for relief because Defendants met all of their contractual obligations to Dalton, and because Dalton's breaches of contract bar her third claim for relief, and (9) sixth claim for relief because Defendants did not breach the implied covenant of good faith and fair dealing, and the implied covenant does not require Defendants to vary or contradict terms for which they bargained, accept a material change to the terms of the loan documents, or inject substantive terms into the credit agreements.

30

Dated May 23, 2011.

s/ Sean M. Hanlon
J. Kevin Bridston
Sean M. Hanlon
HOLLAND & HART LLP
555 Seventeenth Street, Suite 3200
Post Office Box 8749
Denver, Colorado  80201-8749
Phone: (303) 295-8000
Fax: (303) 295-8261
kbridston@hollandhart.com
smhanlon@hollandhart.com

ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document is being sent this 23rd day of May, 2011, by e-mail to the following:

Otto K. Hilbert, II #18363
Robinson, Waters & O-Dorisio, P.C.
1099 18th Street, Suite 2600
Denver, CO  80202
ohilbert@rwolaw.com

*s/ Sean M. Hanlon*
J. Kevin Bridston
Sean M. Hanlon
HOLLAND & HART LLP
555 Seventeenth Street, Suite 3200
Post Office Box 8749
Denver, Colorado  80201-8749
Phone: (303) 295-8270
Fax: (303) 291-9144
kbridston@hollandhart.com
smhanlon@hollandhart.com


ATTORNEYS FOR DEFENDANTS

5103292_2.DOCX